**ESTATE of Ida Mae OLDHAM, Deceased**

v.

**Ellis CAMPBELL, Jr., District Director of Internal Revenue.**

Civ. No. 2083.

United States District Court
N. D. Texas,
Abilene Division.

March 29, 1963.

820

Grover Cunningham, Jr., Big Spring, Tex., for plaintiff.

Lorence L. Bravenec, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for defendant.

BREWSTER, District Judge.

This suit is brought by the heirs at law of Ida Mae Oldham, deceased, seeking a refund and recovery of federal estate taxes, together with interest, claimed by them to have been erroneously assessed and collected.

The heirs are prosecuting this action because the assessment was paid out of their respective shares of the estate received by them under the settlement of the contest of Ida Mae Oldham's will, and because the estate has been closed since such payment. The total principal amount here claimed in the complaint is $18,130.80.

This litigation had its origin in a disagreement between the taxpayers and the Internal Revenue Service over the proper amount of the charitable deduction. The taxpayers' contention is that the corpus of the estate should not have been reduced by the portion of the income of the estate paid to the contestant heirs in the settlement. The position of the Internal Revenue Service is that the charitable deduction of the estate was properly reduced by the full amount of the value of the money and property received by the heirs in the settlement. Other questions are subsidiary, and will

be set out as they are discussed and decided.

Ida Mae Oldham, a resident of Vincent, Howard County, Texas, died on January 6, 1956, at the age of 86, leaving a holographic will dated April 30, 1936. The will provided for payment of her debts and funeral expenses, bequeathed five dollars to each of her five brothers and two sisters, and made the following disposition of the residue:

"All the balance and residue of my estate of which I shall die seized & possessed or of which I shall be entitled at the time of my decease, I give & bequeath to a home for aged women, to be known as A. C. Sherrick Memorial Home this home to be directed & builded by my executors in the Town of Lubbock Texas."

A. C. Sherrick, for whom the home was named, was the first husband of the testatrix, whom she lost by death. She divorced her second husband, Oldham, in 1928. She was not survived by any children or their descendants. Her only heirs at law were nieces and nephews, or their decendants.

Two friends of the testatrix were appointed co-executors without bond. One of them predeceased her, and the other one refused to act; but her will was filed in the County Court of Howard County, Texas, and the Attorney General of Texas assumed the responsibility of seeking to have it probated for the benefit of the charity to come into existence by its terms. Her heirs at law, who are now the plaintiffs in this tax suit, contested the validity of the will in two courts. They opposed the probate of the will in the County Court on the ground that the testatrix lacked testamentary capacity when she made her will. They also filed suit in the District Court of Howard County asking that the residuary provisions of the will be declared void on the grounds of ambiguity and uncertainty. Either suit, if it had been successful, would have resulted in the entire estate being distributed to the heirs under the laws of descent and distribution.

Helen G. Ashinhurst and Reed Grogan, the testatrix' niece and nephew respectively, were appointed by the County Court on January 31, 1956 to serve as joint temporary administrators to manage the estate under supervision of the Court pending the contest of the will. They qualified and served continuously in such capacity until the temporary administration was finally closed and they were discharged on November 17, 1958.

On November 26, 1957, the District Court of Howard County appointed E. W. Smith and Lee Porter to act as interim trustees under the residuary provisions of the will. Their interim appointment was terminated and they were appointed permanent trustees under the District Court judgment of April 18, 1959, hereinafter mentioned.

The settlement of the claims of the respective parties in the litigation attacking the validity of the will was finally consummated on April 18, 1958 by payment to the heirs of a total of $175,000.00 cash and the conveyance to them of a one-fourth non-participating royalty interest, equal to a one-fourth of one-eighth of all oil, gas and minerals then owned by the estate in certain properties in Howard, Midland and Martin Counties, Texas. All parties hereto accept the appraised value of $7,860.00 assigned by the Engineer Revenue Agent to the non-participating royalty interests. The money and properties were to be distributed among the heirs as if they had received them under the laws of descent and distribution of Texas. The settlement was approved by and carried out under a judgment of the District Court of Howard County, Texas, dated April 18, 1958, in the cases involving the litigation attacking the validity of the will. By the terms of the compromise, the heirs agreed to pay all federal estate and state inheritance taxes which might be owing by reason of the settlement, and the $175,000.00 cash due the heirs

was distributed in the following manner:

Preliminary distribution to
the heirs .................$121,108.04

Attorneys' fees in connection
with will contest .......... 21,981.16

First payment to federal government for estate taxes .... 9,693.77

Payment to federal government of assessment for claimed deficiency in estate taxes and interest ......... 19,125.34

Payment to State of Texas
for inheritance taxes ...... 925.76

Final distribution to heirs .. 2,165.13
$175,000.00

All litigation over the will was in the District Court and consolidated as one action when the settlement was consummated. The judgment of that Court approving the settlement also decreed that the residuary clause of the will was not ambiguous and uncertain, that the will was valid, and that the probate of the will was confirmed. It was that judgment which appointed E. W. Smith and Lee Porter permanent trustees to administer the charitable trust created by the residuary provisions of the will.

The value of the money and properties of the estate of Ida Mae Oldham was $570,954.61 at the time of her death. It consisted of real estate, most of which was ranch land, cash deposits, cattle and a relatively small amount of other personalty. The debts of the testatrix were $13,767.77; the funeral expense, $5,006.50; and the administration expense, $57,811.75. When the total of those amounts was deducted from the $570,951.61, a gross estate of $494,365.59 was available for distribution to the charity and the heirs at law as of the date of the testatrix' death. During the period between the time of her death and the date of the settlement with the heirs, the estate received bonuses upon the execution of oil and gas leases totalling $91,660.00 and other revenue amounting to $28,109.58, giving it a total of $119,769.58 in addition to the original corpus. The

operating expenses during that same period were $11,491.25, leaving a net revenue of $108,278.33.

The total of $91,660.00 in bonus money for the execution of separate oil and gas leases to two different oil companies was received only three or four days before the consummation of the settlement. The leases covered the two Oldham ranches, one in Midland County and the other in Howard County, comprising about nine sections of land. They were made and consummated through the efforts of Mr. Guilford Jones, attorney for the heirs, after extensive negotiations covering a considerable period of time and more than ordinary difficulty. Some thirty to sixty days before the execution of the written agreement compromising the will contest, Mr. Jones and the Attorney General had reached an informal understanding on the settlement of the will contest. It was, however, contingent on the consummation of oil and gas leases for a total bonus in the area of $90,000.00. It was only when the bonus money from such leases was available that the settlement agreement was actually carried out.

Since there were two oil company lessees, there was more than one check for the lease bonuses. The deposits of them were made on April 14 and 15, 1958 in a checking account in the State National Bank, in Big Spring, Texas, which had been used as the checking account for operation of business throughout the administration of the estate. The balance in the account immediately prior to the first deposit of the bonus money was $8,042.73. On April 18, $129,334.75, representing an original deposit of $125,000.00 and accrued interest of $4334.75, was transferred from a savings account to the checking account. The cash portion of the settlement to the heirs was paid out of that checking account balance of $229,037.48. The amount left in the account was apparently used to pay administration expenses.

The following computation, applying all of the corpus in the account on the payment of the settlement, shows the

least amount that could be said to have been paid to or for the heirs out of revenue received during the administration of the estate:

Checking Account in State National Bank

Total cash paid on settlement .....................$175,000.00

Less—

Cash in account before
first bonus deposit .................$ 8,042.73

Transfer of original
deposit from savings
account ........................$125,000.00
$133,042.73 $133,042.73

Total actually paid out of
proceeds from bonuses and
interest on savings .............................$ 41,957.27

The Estate Tax Return shows that, at the time of her death, the testatrix had cash totalling $480,665.57 in various checking, bank savings, time deposits, and postal saving accounts. The estate had on hand approximately $450,000.00 in liquid assets, in addition to the oil and gas lease bonus money, when the settlement was finally approved on April 18, 1958.

The estate filed a Form 706 Estate Tax Return on October 7, 1957, another on May 29, 1958 and a third on July 11, 1958. The first return set out that the estate tax could not then be computed because of the pending litigation. The second return computed the estate tax on the most favorable theory asserted by the plaintiffs in this suit, and arrived at a tax due in the amount of $9,693.77, which was paid with the filing of the return. The third return was filed as an amendment and showed no further tax due.

Upon audit and examination of the Estate Tax Returns, the Internal Revenue Service refused to agree with the taxpayers' position. On the other hand, it reduced the charitable deduction by $182,860.00, the full value of the settlement with the heirs. A tax deficiency plus accrued interest was asserted; and on October 2, 1958, the estate paid $19,-125.34, which included $16,946.50 tax deficiency and $2,178.84 interest.

The following statement from the defendant's "Memorandum in Support of Position of United States on Question of Jurisdiction", filed in this case on May 21, 1962, is adopted as a statement of the facts, as far as it goes, in connection with the filing of the claim for refund:

"On October 3, 1960, a claim for refund of estate taxes in the amount of $18,130.80, plus interest, was filed. Such claim was signed on behalf of the Ida Mae Oldham Estate by Guilford L. Jones, 'Attorney-in-fact', and Lee Porter, 'Trustee'.

"On December 2, 1960, Guilford L. Jones wrote Mr. Ellis Campbell, Jr., District Director, as follows:

"'I have your inquiry as to my authority to file a claim for tax refund in the Ida Mae Oldham Estate.

"'I was the attorney who represented the claimants originally, and in addition, I have specific authority from each claimant in the present claim. Mr. Porter, on the other hand, represents the Trust and actually has no interest in this claim.'

"On March 3, 1961, and on March 23, 1961, powers of attorney in behalf of Guilford L. Jones were received by the District Director of Internal Revenue for all of the plaintiffs herein except Frances G. Crumpacker, Mathew Robinson, Grover Robinson, Mabel Robinson Wyatt, and Russell Grogan. Said powers of attorney were executed on December 27, 1960, or thereafter. Said powers of attorney ratified and confirmed all claims or other documents that Guilford L. Jones may have filed previously."

At the time the claim was filed, Mr. Jones had authority from all of the heirs, with the possible exception of Mabel Robinson Wyatt and Russell Grogan, to assert the claim on their behalf. However, he had not attempted to obtain formal powers of attorney evidencing such authority until after he received the inquiry from the District Director mentioned in his letter quoted above.

By letter dated April 28, 1961, addressed to Estate of Ida Mae Oldham, c/o Guilford L. Jones and Lee Porter, Big Spring, Texas, Ellis Campbell, Jr., District Director, Internal Revenue Service, Dallas, gave notice that the claim for refund had been disallowed in full.

This suit was timely filed on November 13, 1961 in the names of all of the individual heirs at law as plaintiffs, including the five who never executed powers of attorney for filing with the Internal Revenue Service.

The defendant attacks the jurisdiction of this Court on the ground that a proper claim for refund was never filed. The pre-trial order prepared and signed by the attorneys who actually tried this case stated their respective positions on this point to be:

"Defendant claims that this court lacks jurisdiction for the reason that a proper claim for refund was not filed. The refund claim filed is claimed by defendant to be improper for the reason that same is not signed by persons with proper authority. Plaintiffs contend that the signing of such claim for refund by a trustee acting under the will of IDA MAE OLDHAM, Deceased, constitute a valid claim for refund, and in the alternative that a signature on such claim for refund by MR. GUILFORD L. JONES, an attorney at law and the agent of the Plaintiffs herein, whose actions were subsequently ratified by formal declarations in writing constitutes a proper claim for refund."

The point will be decided upon the last position stated by the plaintiffs; that is, that the legal requirements were satisfactorily met by the filing of formal powers of attorney executed by the heirs who owned the refund authorizing Guilford L. Jones to act as their attorney-in-fact and ratifying his prior actions in connection with the claim, even though such powers of attorney were not filed simultaneously with the claim. Discussion of the other ground urged by the plaintiff will therefore be unnecessary.

■■ There is no question about the fact that the filing of a proper claim for refund is a condition precedent to the filing of this character of suit. 26 U.S.C.A. § 7422, Internal Revenue Code of 1954. It is likewise settled that if the claim is not filed by the taxpayer himself, the person purporting to act for him must file with the Internal Revenue Service an adequate power of attorney evidencing his authority to act in the matter. Treasury Regulations, Sections 601.502(b) (5) and (c) (1), (2).

Guilford L. Jones did in fact have authority from the present plaintiffs to act in their behalf when he filed the claim for refund, even though such authority was not then evidenced by a formal power of attorney. When the District Director called to his attention the fact that powers of attorney were required by the Regulations, he did secure and file with the Director such instruments from all but five of the thirty-four heirs. Those powers of attorney were delivered

to the Director from forty-seven to sixty-seven days before the claim was acted upon. The Director received and filed all of them, some as of March 3, 1961, and the others as of March 23, 1961. The defendant does not question the adequacy of those powers of attorney either to grant the necessary authority to act, or to ratify the previous filing of the claim and all actions taken in connection therewith.

■ The heirs were proper parties to give the powers of attorney. While the estate taxes had been paid by the temporary administrators under order of the courts in Howard County, the estate had been closed and they had been finally discharged when the claim for refund was filed. The residuary estate had passed to the trustees appointed by the District Court on April 18, 1958. Under the terms of the settlement agreement, all estate taxes were paid by representatives of the estate out of the $175,000.00 cash due the heirs. Although the tax deficiency was paid in the name of the estate by the temporary administrators, any refund belonged in fact to them. There was no other party at interest to give a power of attorney.

■■ While several contentions are argued in connection with the propriety of the claim, the real question for decision is whether the Director had the authority to accept and file the powers of attorney when they did not accompany the claim itself. The defendant argues that he was prevented from so doing by the following provision of Treasury Regulations, Sec. 601.502(c) (2): "* * * The requirement of a power of attorney to authorize prosecution of a claim for refund by an attorney or agent of the claimant shall not be waived."

No cases directly in point have been cited by either side. However, the only conclusion from a reasonable construction of the language quoted is that it applies to the *fact* of filing a power of attorney, rather than to the *time* of filing it. There is good reason for a manda-tory requirement of formal written evidence of authority that would prevent a disappointed claimant from attempting to get two chances at a refund by contending that the person purporting to act as fiduciary for him was not in fact his agent or attorney. On the other hand, the Internal Revenue Service could not be prejudiced by the delayed filing of a power of attorney properly evidencing authority for the filing and prosecution of a claim, if such power of attorney were furnished a reasonable time before action on the claim itself. The filing of the power of attorney in this case from forty-seven to sixty-seven days before the disallowance of the claim was reasonable under the circumstances.

■ The defendant attempts to make a point out of the fact that the claim for refund was filed with the Internal Revenue Service in the name of the Estate of Ida Mae Oldham, Deceased, and that this suit was brought in the names of the heirs themselves. The facts already reviewed show the changes that took place in the administration and existence of the estate during the period from the time of the assessment and payment of the deficiency to the date this suit was filed. The powers of attorney filed by the various heirs with the Internal Revenue Service settled all question as to whether they were parties to the proceeding there in connection with the claim. The Internal Revenue Service could not have been misled or prejudiced in any way by the manner in which the claim was filed. Its agent's careful examination of the settlement of the estate lead to the assessment of the deficiency. The Internal Revenue Service knew from the terms of the compromise agreement itself that even though the administrators of the estate performed the ministerial act of actually transmitting the payment of the deficiency, the money in fact came from the $175,000.00 cash portion of the settlement due the heirs, and that, therefore, any refund of the payment belonged to the heirs themselves. The claim for refund stated on

its face that the estate had been finally closed and divided between the heirs and the charity; but a permanent trustee appointed to act under the residuary provisions of the will signed the claim, along with Guilford L. Jones, attorney-in-fact. The Internal Revenue Service had before it, then, at the time it considered the claim for refund, all parties who might possibly have had any interest in such claim. Their status was such that they would be bound by the decision of the Internal Revenue Service to the extent provided by law. When the time came, after disallowance of the claim, for the filing of this suit, the plaintiffs properly brought it in their own individual names to comply with Rule 17(a), Federal Rules of Civil Procedure, requiring that "Every action shall be prosecuted in the name of the real party in interest * * *." See John v. United States, D.C., Wis., 1956, 138 F.Supp. 89. This point is therefore overruled.

Under the particular facts of this case, this Court has jurisdiction of the person and the subject matter as to all plaintiffs except Frances G. Crumpacker, Mathew Robinson, Grover Robinson, Mabel Robinson Wyatt and Russell Grogan, who never at any time filed powers of attorney authorizing the institution and prosecution of a claim for their benefit. Those five plaintiffs cannot legally maintain a suit for refund of their portion of the taxes in question.

The next question is the one fundamental to this case dealing with the amount of the charitable deduction which should have been allowed in computing the estate tax. The extent of the charitable deduction will be determined by the amount of income of the estate which was legally attributable to the payment of the $175,000.00 cash portion of the settlement with the heirs.

 Three matters bearing on the solution of this question are recognized without dispute by both parties. First, the trust created by the residuary provisions of Ida Mae Oldham's will is a charity. Second, the amount of the charitable deduction available to the estate should be reduced to the extent of the value of the corpus received by the intestate heirs as a result of the settlement. Sage v. Commissioner, 3 Cir., 1941, 122 F.2d 480, 137 A.L.R. 658; Thompson's Estate v. Commissioner, 2 Cir., 1941, 123 F.2d 816; Irving Trust Co. v. United States, 2 Cir., 1955, 221 F.2d 303, 306; Luehrmann's Estate v. Commissioner, 8 Cir., 1961, 287 F.2d 10, 15; Internal Revenue Code of 1954, § 2055(a) (2). Third, the burden was on the plaintiffs to prove that income of the estate was actually applied on the payment of the $175,000.00 cash portion of the settlement. Luehrmann's Estate v. Commissioner, supra.

The pre-trial order shows the plaintiffs' claim in connection with this question to be:

"Plaintiffs claim that during the period of time that this estate was being administered and was in controversy, as to who the recipients would be, there was an increase in the estate to be distributed, which increase was not a part of the estate for purposes of estate taxation, and that the estate for estate tax purposes is the net estate which was distributed to the natural heirs of IDA MAE OLDHAM, less a proportional deduction from such distribution attributable to the increase in such estate."

The defendant opposes the plaintiffs' contention on the grounds, first, that the bulk of the money the plaintiffs claimed to have been income was from oil and gas lease bonuses, which were corpus rather than income, and second, that the plaintiffs failed to discharge their burden of proving that any of the money used in payment of the $175,000.00 on the settlement with the heirs came from revenue of the estate rather than from its corpus.

The defendant cites San Antonio Loan & Trust Co. v. Hamilton, 1955, 155 Tex. 52, 283 S.W.2d 19, 27, in support of its

argument that an oil and gas lease bonus is corpus, and not income. This is only one of the number of instances where the state law differs from the federal tax law on what is corpus and what is income. This point has been definitely settled contrary to defendant's contention since Burnet, Commissioner v. Harmel, 1932, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199.

 The Court is of the opinion that the plaintiffs did discharge their burden of proving that a substantial amount of the $175,000.00 cash portion of the settlement was in fact paid to them from income of the estate, rather than from its corpus, by establishing first, that the settlement was contingent on the estate's getting the oil and gas lease bonuses for use in helping to pay the intestate heirs, and second, that a substantial part of the $175,000.00 cash portion of the compromise was actually paid out of such income from such oil and gas lease bonuses and from interest on a savings account.

 The Attorney General of Texas was looking after the interests of the charitable trust to come into being under the residuary provisions of the will. The policy of that office to insist on participating in litigation of this character on behalf of charities was so general, widespread and long established that, if necessary, the Court would take judicial knowledge of it. That policy led directly to the passage in 1959 of Art. 4412a, Vernon's Annotated Texas Civil Statutes, which provides that the Attorney General of Texas is a necessary party to litigation in this State questioning the creation or validity of a charity or seeking to distribute its assets to others than charitable donees. The extent of recognition of this policy in litigation pending before the passage of the statute is shown by the following testimony of Guilford L. Jones, the attorney who represented the intestate heirs in the contest over the will:

"* * * I went both ways, Your Honor, both a contest and a suit to construe, both in the county court and in the district court, bringing the Attorney General in."

He further said:

"I didn't know, Your Honor, where to go, so I went both ways at the same time. And the adversaries were actually ourselves representing the heirs and the Attorney General representing the charitable trust, there being no executor acting for and on behalf of the estate."

The first Estate Tax Return, filed on October 7, 1957 said on Schedule N:

"This estate is presently in litigation between the intestacy heirs and the charitable trust representatives provided for in the will of Ida Mae Oldham. The Attorney General of Texas who represents the charity, does not want the estate to pay out the funds of the estate on the theory that the estate will eventually go to the intestacy heirs. * * * *"

The settlement agreement was actually negotiated with and signed by the Attorney General through his assistants.

Under the circumstances, the Attorney General of Texas had a legal and recognized status in the litigation over the will as being the representative of and spokesman for the charity. That was an important factor which the contestants of the will had to consider in attempting to settle the case. They had formidable, able opposition in the person of a state officer charged with the duty of carrying out a trust not only to the charity but to the public as well. It was only logical for him to attempt to see that as much of the original corpus of the estate as possible be delivered to the charity at the end of the litigation.

The negotiations between Guilford L. Jones, lawyer for the contestants, and the Attorney General for a settlement began in July, 1957. A number of conferences between them followed. Mr. Jones had begun attempting to interest oil companies in oil and gas leases on the two ranches of the estate in May, 1956. Extensive dickerings had failed either

because of inadequate price or of inability to meet title objections. The continuation and progress of the efforts to lease had a direct influence on the settlement negotiations. In October, 1957, Mr. Jones advised the Attorney General that it appeared he could get at least $60,000.00 and possibly as much as $90,000.00 for the estate for oil and gas leases on the two ranches. The following testimony of Mr. Jones, which the Court finds to state the facts, summarizes the progress from that stage:

"So when it became apparent that I was going to lease this thing, we had more discussions and negotiations. After considerable negotiation, we arrived at the settlement figure of $175,000.00, plus one-fourth of the royalty to the heirs in full settlement for the claim. I had previously gotten authority from my people to settle for that figure. When I had come back from Austin the last time, I kind of decided in my own mind that about $175,000.00, somewhere along there, would be the most the Attorney General would pay.

"So we entered into an informal agreement at that time and later on, thirty or sixty days later—you have the date there somewhere—we finalized the agreement in a two or three page instrument. *And the agreement, of course, was contingent, of course, on my being able to consummate the leases.*

"We went back and started trying to satisfy Lone Star Producing on the title objections and this was a very difficult proposition, where you had suits pending, where you had temporary administrators and you had no trustees appointed, and no executor representing the estate; only the Attorney General representing the charity interest.

"An attorney in Fort Worth was named by the Lone Star Producing and Texas Pacific to work out the title for both of them. We worked jointly for sixty days and went through a great deal of corrective procedures. We finally consummated the settlement agreement." (Emphasis added).

This testimony is confirmed by the date of the settlement itself and the delay in consummating it until after the lease bonus money had been received, even though the estate had far more than adequate cash to carry out the terms of the agreement at the time it was signed on December 24, 1957. At that time, the estate had on hand over $450,000.00 cash, in addition to its real estate and other personal property, with all claims against it already paid. No reason appears for waiting until the following April 18th to begin closing the settlement, unless it was contingent upon receipt of the lease bonuses. The following testimony of Mr. Jones, in answer to the question as to whether the cash portion of the settlement was paid out of the bank account in which the bonuses were deposited, further confirms that such was the case:

"Oh, yes. In fact, it was done immediately thereafter. As I said, the oil and gas lease bonus money was deposited on the 14th and 15th. The savings account was transferred on the 18th. *That was all we were waiting on.* So on the 22nd we issued checks in that amount into the registry of the district court of Howard County, Texas, for $143,090.00. Now that $143,090.00 represented the $175,000.00 sum, less a sum which was being retained for satisfaction of estate taxes." (Emphasis added).

The defendant argues that the Court should not recognize the understanding making the agreement contingent upon the consummation of the oil and gas leases, when it was not incorporated in the contract itself. Ordinarily, such an argument would be very persuasive, as it would be considered that there would be too much uncertainty about whether such an understanding was had, and too much unreliability about its being car-

ried out. It is felt, however, that the matter rests on firm ground under the particular facts of this case. Convincing circumstances corroborating the existence of such an understanding have already been given. The provision in the written contract requiring that it be submitted for approval to the District Court in which the litigation over the will was pending was an adequate safeguard against an attempted enforcement of the settlement contrary to the contingency about the lease bonuses. It would be unreasonable to assume that the Court would have approved the settlement if the Attorney General had opposed it on any plausible ground. In this connection, it is significant that the compromise settlement was not submitted to the Court for approval until three days after deposit of the last bonus money.

In further support of its position that the plaintiffs failed to discharge their burden of proof, the defendant relies heavily upon the following language in the April 18, 1958 judgment of the District Court:

"* * * At no time shall said heirs at law, or any of them, ever be entitled to receive any bonus money or rental money accruing or becoming due by reason of any present oil and gas leases or other mineral leases now existing upon said land, or any part thereof, or which may become due upon the execution and delivery of any future oil and gas leases or other mineral leases upon said lands, or any portion thereof, nor shall it become necessary upon the part of any of the heirs at law of the said Ida Mae Oldham to execute, ratify or confirm any present or future oil and gas leases or other mineral leases upon said lands, or any part thereof. * * *"

The language just quoted is the sentence immediately following that portion of the judgment which describes the one-eighth non-participating royalty interest to go to the heirs at law under the terms of the settlement. All of it is in the same paragraph. Such a provision is common in an instrument creating a non-participating royalty interest. It is what makes a royalty interest non-participating. The language did not apply to income already received. It pertained only to such income from oil and gas lease bonuses and rentals as might be received following the time of the vesting of the fractional royalty interest in the heirs.

The decision that all the $175,000.00 cash portion of the settlement was not paid out of the corpus makes it necessary to arrive at a formula for determining the amount of income that could be properly applied thereto. A number of methods have been suggested by the parties. A thorough consideration of them has resulted in the conclusion that the most reliable and just one would be to determine first, the proportion or percentage that the $108,278.33 net income of the estate bore to the $602,644.94 total of the corpus and income available on April 18, 1958 for distribution to the charity and the heirs at law, after deduction of all debts, funeral bills, and then existing administrative expenses. The 17.96% percentage figure thus obtained would then be applied to the full $182,660.00 value of the settlement; and the resulting $32,841.66 would be the amount of the settlement attributable to income. The formula may be summarized as follows:

$$\frac{\$108,278.33}{\$602.644.94} \times \$182,860.00 = 17.96\% \times \$182,860 = \$32,841.66$$

The charitable deduction allowed in the audit by the Internal Revenue Service would therefore be increased by $32,841.66.

The defendant's pleadings ask for a recoupment ·of the amount of income taxes owing by the plaintiffs because of receipt of the income here involved, if it should be held that they are entitled to a refund. After first contesting the right to a recoupment, the plaintiffs recently filed a brief admitting that such right existed, but insisting that the defendant had failed to offer sufficient proof from which such income could be computed. The case was re-opened to allow the production of such evidence. The proof offered and the further stipulations made by the parties at the last hearing resulted in agreement on computations, subject to the action of the Court on the plaintiffs' claim that they should be allowed to deduct the fees paid their attorneys for representing them in the contest of the will.

The plaintiffs claim that the entire attorneys' fee is deductible, and that the allowance thereof would result in their owing no income tax. The "Defendant's Memorandum in Support of Recoupment Claimed" filed herein on March 26, 1963, states the defendant's position to be:

"The Government concedes, for the purpose of this case, that taxpayers are entitled to deduct that portion of attorney's fees which is allocable to the distributable net income earned by the estate after the decedent's death but contends that the remaining portion of these attorney's fees which is allocable to the corpus of the estate constitute a personal expense for which deduction is not allowable under the Internal Revenue Code."

The deduction for the full amount of the attorneys' fee cannot be allowed under the rule announced in Merriman v. Commissioner, 1 Cir., 1939, 55 F.2d 879. The footnote on the first page of the Annotation: "Income Tax—Deductions" 39 A.L.R.2d 883, states that the provision of the Internal Revenue Code of 1926, which was in force at the time the Merriman case was decided, was not substantially changed in the Codes of 1939 and 1954. Section 17 of the Annotation, beginning at page 938, shows that Merriman has been consistently followed. The case of Zietz v. Commissioner, 1960, 34 T.C. 369, cited by plaintiffs, is distinguishable on the ground that the taxpayer's purpose in incurring the legal fees in that case "was not to perfect his title to the properties but was to maintain and conserve his income-producing property." (34 T.C. p. 383). The Tax Court emphasized that the circumstances of the case were unique (34 T.C. p. 380), and it is apparent it had no intention of departing from the rule announced in the Merriman case.

The parties have been informed of the formula that would be applied in determining the amount of the charitable deduction, and of the Court's opinion that all of the plaintiffs' attorneys' fees in the contest of the will could not be allowed as a deduction in computing the income tax due. They have agreed that the amount of recovery to which the plaintiffs would be entitled under the Court's holding would be $6,737.35, with legal interest from April 6, 1957. Their agreed calculations are accepted.

The five plaintiffs hereinbefore named who did not file powers of attorney with the Internal Revenue Service will not share in the $6,737.35 and interest. It will be distributed among the other plaintiffs in the same proportions as they paid the estate tax deficiency.

This opinion will serve as findings of fact and conclusions of law under Rule 52(a), Federal Rules of Civil Procedure.

Judgment will be entered in accordance with this opinion.